All right. Katie Hrolbrink, on behalf of Amicus Federal Defenders, good morning, Your Honors. I've conferred with Mr. Taylor about the smoothest way to split this argument, and to that end, I'm happy to discuss why 922G9 is unconstitutional in all cases, while Mr. Taylor focuses on the facts of his client's particular case. That said, each of us welcome all questions from Your Honors. I'm going to ask both sides the same question. I've gone through every Bruin case that the Ninth Circuit has had, and in every one in which I can find in which the case was decided below before Bruin, we've vacated and remanded for the district judge to apply Bruin in the first instance. What's your view on whether we should do that? Your Honor, I do think it would be sensible to remand in this case. Not only does Your opinion, but just as Judge Gutierrez said, the government didn't have an opportunity to come forward with particular historical laws, their particular historical context, and we see the fruits of that in the government's briefing, that it's primarily broad claims based on law review articles. And we know now from cases like Rahimi and Range that you have to get into the details. The details of these laws are complicated, they're contested, the historical context matters, and I think all of that could be profitably worked out on remand. Assuming we get to step two of Bruin here, I'm not going to hang you up on step one. What do you think of Justice Barrett's dissent, then Judge Barrett's dissent in Cantor, where she says there's a rich historical history of us disarming the violent? Sure, Your Honor. So I think the Cantor dissent has a lot to recommend it. I agree with a lot of what's in that dissent. You're agreeing with the part about felons in possession. I know, but that's not what I'm asking. Naturally. But I think the conclusion Your Honor is referring to, it goes awry at a couple of points. I think one, Justice Barrett relies too much on British history between the years 1660 and 1688. She talks about laws disarming dangerous people, giving the Crown's agents broad powers to carry out that kind of disarmament. But later on, Justice Barrett signed on to an opinion in Bruin, which says that that period, the period between 1660 and 1688 actually prompted the codification of the English Bill of Rights because it was deemed so abusive. She also points to, and let's assume for a moment that these were either racially motivated or improperly motivated, but she points to a series of legislative acts, if you will, in the early Republic that took the, that took firearms out of the hands of people not viewed as trustworthy, perhaps liable to pose a danger to society. Those laws may be unconstitutional for separate reasons, but don't they show that the founders thought that you could keep guns out of the hands of dangerous people? So again, Your Honor, I think it is important to get into the details here. The particular laws that Justice Barrett and also the government rely upon are, first, laws concerning enslaved people and Native Americans. Those laws aren't informative because enslaved people and Native Americans weren't, didn't have rights. They didn't have Second Amendment rights. So they don't tell us about our historical... They also dealt with Catholics. Presumably they had Second Amendment rights. So Your Honor, the government says that there is this tradition of disarming Catholics that actually... Papists. I'm sorry? Papists, actually. Oh yes, Papists, exactly. But the government, the law review article the government cites, it's by a scholar, Robert Churchill, he actually reaches the opposite conclusion. He says that he doesn't see a tradition in the colonies of disarming Papists, Catholics, on the basis of their faith. And in fact, he says the only law he sees is a Virginia law. That law specifically carved out and allowed Catholics to keep whatever arms they needed for their self-defense. I'll also just note that the same scholar drops a footnote saying that some have relied on a Maryland law that was broader, but those historians are just mistaken. That was a bill that was never passed into law, so it's not part of our historical traditions. If your client had been, the client in this case was Julius, had been convicted of a felony, would your answer to, would your approach to this case be different? I think it would require a different analysis, certainly, Your Honor. What's the historical analog that distinguishes a felon in possession of a firearm versus a misdemeanor convicted of a pretty serious and also potentially dangerous crime? Such as domestic violence, misdemeanor. So, Your Honor. What in the history distinguishes one group versus the other? Sure, Your Honor. So, of course, it is the government's burden to come forward with those analogs. I will say that one of the government's felony-specific arguments involves some of the regulations underlying virtue theory, is what we've called it in our amicus brief. And this virtue theory that some scholars have endorsed kind of infer the right to take away arms from felons based on the particular disabilities attendant to felony conviction at common law. You've looked at scholars. Judge Bay has recently written about that, and he said that traditionally rights were taken away from felons. I'm not familiar with that work, Your Honor, but that could be an example of the kind of felony-specific arguments that would be available to the government in a different case. In fact, that could have been made a felony, but the jurisdiction, in this case, the client was accused initially of rape. He made a plea deal. He pleaded to domestic abuse of some kind. But what if the domestic abuse statute in the jurisdiction requires the same kind of violent act that would have supported a felony? What do we do then? Sure. So, first of all, Your Honor, I just want to clarify, we are not conceding that felons could be disarmed either, as amicus says. No, in fact, I'm sure we're going to see you at a later date on that. I'm not arguing that every felon is entitled to possess a Thompson machine gun. I mean, that's your job. I'm not criticizing the court. Sure. I'm just trying to figure out what the limits are. We can assume for this case that felons in possession statutes could be constitutional, and then we'll take the argument from there. Certainly, I think it would require a different analysis. It would require a different analysis for that kind of statute, and there may be distinctions. But to answer Your Honor's question, it would be unconstitutional to strip a person of rights on par with a felon without requiring the government to plead and prove a felony offense. So, your argument is that no misdemeanor conviction can lead to loss of Second Amendment rights? I don't know that I would necessarily... Well, you just said that. If that's not your argument, what's the limit to it? Well, so I guess all I'm saying, Your Honor, I think it is a statute-by-statute analysis, but I don't think the government has brought forward in this case evidence of a historical analog that would allow somebody, just because of a misdemeanor conviction, to be disarmed for life. And I think the lifetime disarmament component of this is... Well, counsel, let me ask you this, because some felony convictions are much less... But they're nonviolent, whereas some misdemeanor convictions pose a greater danger. So, would you draw the distinction there between individuals who are convicted of offenses in which the legislature has deemed them to pose some sort of dangerousness risk? No, Your Honor. We think that argument from the government operates at far too high a level of generality. The Bruin test requires courts to look to the government's comparators and the challenged law and determine if they're sufficiently similar. It doesn't allow courts to look at a variety of dissimilar laws, impose a sort of umbrella label... Well, but what level of generality are we to look at? Let's start from the assumption that at the founding, and indeed at the time of the adoption of the 14th Amendment, women were viewed as the property of their husbands, as were children. And so nobody thought domestic abuse was really a problem. We learned later it was a big problem. And the legislature has decided they wanted to keep guns out of the hands of people who engaged in that kind of violence. Is it your position that because the founders didn't think so, then the Second Amendment bars all these laws? So, first of all, Your Honor, I'm not sure it's correct to say that it wasn't considered a problem at all, but just setting that aside for now, I... Sorry, I lost my train of thought. Well, no, we've got a new context because it's a context that we now recognize, and have only recognized for a relatively short period of time, is a separate problem from assault in general, particularly vulnerable population. And so we've set up a set of laws that protect that population. That population was not recognized as vulnerable at the founding, or even in 1867. So, what you're saying is, well, tough luck then. The Second Amendment, there's no historical analogues, we all go home. Just quickly, for Your Honor's question about the Bruin analysis in general, there is enough play in the joints that I don't think you would have to point to a DV-specific statute in order for the government to meet its burden. But, for example, if the government was able to put forward a tradition of disarming for life people who committed misdemeanor assault and battery in general that wasn't targeted at DV, I think that would clearly meet their burden. So, there is enough flexibility to accommodate that. You've touched on it a couple times. Does the fact that this ban is for life, does that make a difference? I think so, Your Honor, because in looking to historical comparators, we are also asking how much the right was burdened. And here, it is, as this court said in Chauvin, a heavy burden. It's a complete deprivation of the right for life, even, you know, 30, 40, 50 years on. And so, the government, to my knowledge, has not pointed to any comparators that are actually real comparators. As we said, things, regulations on, for example, enslaved people don't fit the bill there. But I don't think the government's pointed to any comparator that imposes that kind of burden. With that, I see end over time. All right. Mr. Taylor, welcome. Thank you, Your Honor. May it please the court, Josh Taylor for Brandon Yates. I intend to argue for eight minutes and reserve two. Judge Hurwitz raised the question of a remand. What are your thoughts on that? I think that Judge Nye would likely like the opportunity to weigh in. Of course, when this happened, he did not have that opportunity because Bruin had not been decided, and he relied on Ninth Circuit precedent to deny my motion. On the issue that you proposed to address, I'm not sure I found anything in Judge Windmill's order that addresses that. Did you preserve that issue below, the as-applied issue? In Judge Nye's order? Judge Nye's order, I'm sorry. I'm looking at the previous case. But is there something that addresses your as-applied argument? I believe that in—I think that I touched on it briefly. I can see why the court is raising that question and not particularly thoroughly. And so I'm wondering, you might welcome a remand, because I'm not sure you've sufficiently preserved the issue for our review. That's what I'm asking. I'm not as particularly worried about whether the court rules on the as-applied versus the facial challenge. I think that we're here today, we're developing some very important case law for a tremendous amount of people whose lives and incarceration hangs in the balance. But if it were remanded, I would certainly develop that. So for purposes of today's argument, counsel had said that you would address the arguments that are particular to the as-applied challenge. Are the arguments independent of the facial challenge that you want to raise? Well, the arguments that I would raise in terms of the as-applied challenge would likely be sort of more along the lines of a facially as-applied, if you will. And the court has sort of touched on this in terms of if I were looking at the as-applied challenge, I'm looking at Branton's circumstances at the time he was arrested. He peacefully possessed a .22-caliber rifle in the safety of his own home. He bought it solely to give it to his son. He had never fired it, ever, never intended to use it. It was solely as a gift. So I would look at things in terms of temporally and spatially. It's been two decades since his conviction. That's why I asked the question. Your brief doesn't raise the notion that, well, maybe this could be applied to somebody for five years or three years, but we're 20 years later. Your brief has one paragraph on the as-applied argument. And it basically says it's unfair because he had it in the home and lawfully bought it and intended to give it to somebody. I would say this. The as-applied argument runs counter to the government's argument that it has to meet under the historical burden of Step 2 of the Bruin analysis. And the reason is this. The government has to show a historical analog, not necessarily a twin, but an analog. So when the government points at the analogs... Isn't that the facial challenge? I guess I'm trying to figure out if there's anything independent of a facial challenge. I mean, obviously, if you win on the facial challenge, you win, right? Right. But, you know, there are facts in this case that are favorable to your client, arguably so the age of the conviction, the fact that it's a misdemeanor. I'm not aware of any regime that allows him to challenge that, that, hey, somebody like me really should get my Second Amendment rights back. I suppose that the challenge truly does run more to a facial challenge than an as-applied challenge. I think that I'm looking at Brandon's sort of unfortunate circumstances, if you will, in terms of who he was at the time and what was happening and that he spent a year and a half of his life in prison for this. So possibly I'm arguing sort of parallel things, but I should call it a facial challenge rather than an as-applied challenge. And those are the things I'm looking at that the court could consider. So, you know, for example, when I read it, I thought maybe you were saying, well, this might be okay if the statute said if you possess a firearm within three years of your misdemeanor conviction. But your argument is it doesn't matter. The facts of your case, I think you're telling us, don't matter. Well, I think that the facts of the case do matter in terms of how we interpret the Second Amendment to the Constitution. Well, okay, so let me change the facts. Let's assume this had occurred within a year of the domestic violence thing. He didn't have the gun. He purchased it lawfully, but it wasn't there for his son. And occasionally he took it outside and shot at the targets. Would the case come out any different in your view? I don't believe so. That's why I'm having trouble figuring out why the as-applied argument makes that difference. The as-applied would matter more if we were digging into the facts of the case. And to be fair, not particularly. The Ninth Circuit argument is not my bailiwick, which is why Amicus is here as well. So I can appreciate that the court pointing that out. Well, then, since you're really addressing the broader argument, let me just pose the question we posed to your friend. How close did the historical analog have to be? I think she finished by saying it doesn't have to be exact. So it doesn't have to be for domestic violence. How close would the historical analog have to be, in your view, to satisfy Bruin Step 2? Well, I would say it would have to be this. It doesn't have to be a twin, which Bruin already tells us, but I don't think it could be a long-lost cousin either. I don't think you can come in and say we disarmed Native Americans, ergo we can disarm everybody. What if you disarmed people who committed assault? If you disarmed people who committed assault, I think that we'd have to look at the length of time that the disarmament occurred and whether it actually suspended the right. From my review of the record, it appears as though just the arms were forfeited and not the right, that the right was never suspended. If there is historical analog for taking away guns from people who are perceived to be dangerous, is that enough? Is that a close enough analog? No, I think it would have to be related as well to the misdemeanor. In terms of this, I think that there would have to be... I don't see historical distinctions drawn between felons versus misdemeanors. The Idaho Constitution draws the distinction. Under the Idaho Constitution, I think it's Section 17. If there is, it really has not been cited or briefed to us. I mean, now I admit I'm no historian. It's in my brief. I have not seen the distinctions drawn between felons and misdemeanors. It's in my brief. It's Justice Robin Brody's dissent in a case from the ninth on cert, United States v. Gutierrez. And she points out that in that case what's at issue is that a felon had his felony reduced to a misdemeanor and the question was whether he could possess a firearm. She points out in her dissent that under the Idaho Constitution, a misdemeanor can never have their firearm rights suspended. At common law, the distinction between felonies and misdemeanors was very different than it is now. Basically, every felony you were executed and misdemeanors were much more minor than they are now. Should we use the common law classification of felony and misdemeanor or the classification that Idaho happens to give at any particular time? I think that the classification that Idaho gives it speaks to, as I argued in my brief, the historical analog, that it's never existed. Well, but Idaho could have called this a felony. It didn't. It didn't. So why do we care what Idaho called it? I think that it goes to whether there's a historical analog. Idaho just doesn't have this in its system. There's no law for this in the system. But we're not limited to looking to Idaho for historical analogs. No, but I think that it speaks to Brandon's understanding of what was going on and the people's understanding of how far a Second Amendment right extends. For instance, in Idaho, the distinction between what constitutes a misdemeanor domestic battery and what constitutes felony domestic battery is just an external mark or an internal mark, a wound. And a common law that misdemeanor battery was probably felony battery. See, that's why I'm trying to figure out why we care what the Idaho legislature, how it now classifies things, or if we're all supposed to be historians, why don't we look at whether this historically would have been a felony? Well, I think that the government has the burden of being the historian and proving that there was a historical analog. I don't have one in the record. It all goes back to the government's burden. Well, it is the government's burden, but it's a huge burden. Placing a burden on a person's Second Amendment right is a huge burden, and it should require that the government meet the heavy burden in order to take it away or infringe upon it. Let me ask you this from a defense attorney's perspective. Drawing the distinction between felons versus misdemeanors, there's a potential downside to that, I think, for the defense bar because there are lots and lots of offenses across the country that are deemed as wobbler offenses. Wouldn't that then cause the prosecuting authorities to not plead things down to a misdemeanor? Well, I would argue first that a Second Amendment right is not suspended for a felony either, at least not a lifetime ban. Second, I do think that the things that we talk about affect how we prosecute people, and it might mean that prosecutors hold someone to a felony rather than a misdemeanor as a result. I think that Judge Ho's concurring opinion in Rahimi sets that concept out, that the Second Amendment right cannot be infringed upon, but that doesn't mean judges can't impose harsher sentences for the conduct in front of them. And I think it's the conduct that we sentence a person for. I'd like to reserve some time for rebuttal, if I may. Thanks. May it please the Court, Serena Hargrove again on behalf of the United States. In terms of the second prong, I think— Before we get to the second prong, let me ask you about remanding for better development of the record. Does the government have additional research that it can do in order to supplement the record in terms of the historical analogs? I mean, is this a situation where now the government can appoint an expert or ask the district court to appoint a historian who can then go through the historical analogs to figure out how things were treated back then? I know we've gotten a lot of briefing, and I'm assuming there's coordination with other U.S. attorneys' offices across the country to figure out what other people are doing in other cases as well, but I wondered whether in the government's view there's more that you can do on this record. Yes, Your Honor, there has been an explosion of research into historic statutes and theory, and we could certainly do more. I think that no new analogies, per se, have been identified as far as I know. I mean, we still have the same analogies to assert, but there are more— we could certainly give more specifics, and yes, we could consider hiring a historian to do analysis, absolutely. The three analogies at the second prong are not perfect, and they are at a certain level of generality. I was heartened to hear the other side agree that domestic violence-specific statutes are not required, and that makes a lot of sense because things have changed drastically since the Second Amendment came to be, and women are no longer chattel, blacks are no longer enslaved. We have a lot of different social and legal and political differences. So when we looked for analogies, we looked for situations where we had one citizen attacking another citizen, potentially, and that's where I believe that the writing Armed in Terror of the People is our first analogy, and it is—it's a very—as Bruin traces it back, it goes back very, very far, but was included in colonial laws as well. Those were statutes, as the other side said, that punished more harshly crimes committed while armed. Yes, Your Honor. Did they disarm? Did they result in the forfeiture of Second Amendment rights thereafter? Your Honor— You asked the question in the last case, because it does seem to me there may be a distinction between taking this into account at sentencing or at charging, and then thereafter saying you cannot—you can no longer legally possess a firearm. Yes, Your Honor, and I think that Your Honor pointed to one big problem in terms of legal and political changes over the time period, is we have such a different system now with felonies and misdemeanors. Most felons, there weren't that many of them, and most of them were executed at the time of the founding. All of your historical analogs, except for the papists and the Catholics and the Indians and the slaves— The non-oath keepers. None of which strike me as something I want to rely much on, involve crimes that were defined by use of a firearm, but they didn't—riding dangerous while armed, robbing a stagecoach while—and those kinds of things. But did they thereafter deprive somebody of Second Amendment rights, which is what this one does, because every time this gentleman possesses a firearm, he will be violating the statute. Right. There are examples of that, and the riding armed in terror of the people, people were disarmed, but it was temporary. The surety or disarmed statutes, that's an area where there just isn't much historical research yet, but they did disarm people if they wouldn't post the security based on the complaint of another citizen. And we also have, in one of the documents we cited— Even somebody who's deemed to be this lawyer could come in and, you know, swear an oath and get the firearms back. How did the misdemeanors such as the defendant here ever get the firearm back, if the statute is deemed to be constitutional? Well, Your Honor, if the legislature has the power to regulate and take away someone's gun, the legislature also has the power to give it back. And there was a really interesting example presented by Cornell and DeNino in a well-regulated right about the Shays' Rebellion. So this was a rebellion in western Massachusetts in the late 1780s over taxes, over the government taxing people. And a great number of citizens took place and rebelled against the government of the state of Massachusetts. Those who had taken up arms against the state were able to seek a pardon for the governor. But to obtain that pardon, they had to take an oath of allegiance to the state and deliver their arms to the state for a period of three years. In addition, during that same time period, they weren't allowed to serve as jurors and do other civic duties. But here we have a lifetime ban on possession of a firearm, even if no firearm was used in commission of the crime. So I'm trying to figure out, the First Amendment analogies aren't perfect, but the Supreme Court seems to be fond of them. If somebody makes a speech that has a true threat in it and is punished for that, calls for the people to attack the Capitol on January 6th, you can be punished for that speech. But after you're punished, you're not deprived of your First Amendment right to speak thereafter. And so I'm trying to figure out why in the Second Amendment context, after the punishment, even if you could be punished during some duration, you lose that right forever after. And, Your Honor, when I think of the defendant in this case, I imagine what if he may have engaged in some kind of true threat speech as well, and I wouldn't be nearly so worried about allowing him to speak freely again as I would allowing him to be armed in the home, given his proven issues with anger management and the problems there. By the way, you said proven. Well, he pled. Yes, Your Honor. He pled to a misdemeanor crime of domestic violence. What was he doing when he pled to it? What was the factual basis to the plea? Well, Your Honor, it was originally charged as a rape, and it was pled down to, I think, the least behavior he could be guilty of for the crime he pled to was an unlawful touching. Do we apply? We asked this question yesterday. Do we apply the categorical approach when we look at the crime, or do we look at the facts of the offense? This has been such an interesting study. As someone who's been applying the categorical and modified categorical approach for the last 20 years, this is the opposite of that. I mean, the colonial legislators had felt the power. They had the power to limit people's rights and to really try and keep an orderly society, and there was no question in their minds that they could do that. I mean, and that's where we have these offensive regulations. To a non-criminal conduct. So let's assume that Mr. Alinas engaged in the crime that he was originally charged with. Yes. The charges got dropped, but you could prove that he committed a sexual assault. Could we have a law that says, upon a restraining order, for example, that was issued because of that? Yes, Your Honor. We do have one. So I'm asking, how far does your principle go? Well, Your Honor, Heller explained that prohibitions on the mentally ill from having firearms, which were very, very longstanding, that nothing in the Heller decision suggested that there was anything wrong with those, that those could remain presumptively constitutional. And then in Bruin, the court says, well, what we meant was that they were presumptively valid. Right. So under the first prong. So you got past the first prong, but we're not going to do any historical research today because that's beneath us. Other folks can do that later. But now they've told us we've got to do the historical research. But only, Your Honor, if you get, well, there's some historical research involved in the first prong. Absolutely. Because we have to understand what that core Second Amendment conduct was. Does that language in Heller only get us past the first prong of Bruin? Or was it meant to satisfy both prongs of Bruin? Since the court disclaimed that it was doing any historical research. Right. It satisfied the first prong. What Heller was saying is that regulations on the mentally ill, keeping firearms from them, it's presumptively constitutional under the first prong. So the inquiry would end under Heller. But the problem is the Supreme Court's also made it clear that the right belongs to all Americans and expressed tremendous concern about shifting the responsibility back or the power, discretion back to legislatures. And I just don't see any framework, and none has been proposed yet, that we can really look at the specifics of the conviction, the seriousness of the conviction. Do we look at how long the misdemeanor conviction was before somebody then is deemed to be less dangerous?  I'm no fan of the categorical approach, but it seems to make a little more sense when you approach a problem like this one. So I take it under the government's argument that the legislature really has the full power to make these considerations. Yes, Your Honor, but there's a political check there too. And in the previous case, Your Honor asked about, you know, minor laws, traffic infractions or something. Could the legislature, does it have the power to say that those people aren't law-abiding? And the answer might be yes, based on Bruin's analysis. But there's a political check there. No one would allow that. But that's exactly what Bruin rejected. I mean, for better or worse, and maybe you can discern my views on which side of that I end up on, Bruin said, we don't trust legislators. We don't trust Congress. We only trust judges. And so we're not willing to leave Second Amendment rights to the tender mercies of the folks that people elect. The question isn't whether a legislature chooses it. The question is whether or not it's rooted in our historical understanding of the Second Amendment. So I don't see how you can argue that leaving this up to the people's elected representatives is consistent with Bruin. So, Your Honor, I think there is a real contradiction inherent in Bruin, and Judge Wynn pointed it out too. On the one hand, the Supreme Court got rid of means and testing, which is a method of showing whether the legislature really had good reasons and was justified in doing what it did. Bruin said, nope, that's out. The balancing was already done when the Second Amendment was enshrined, and we need to look and see what that balancing was. And then that is the thing that is so odd and interesting about Bruin, is then it defines for us very loosely, not in a categorical or modified categorical way at all, very loosely gives us three questions to ask to see if our regulation strikes at the heart of the conduct regulated by the Second Amendment. And those are those first three questions in the first prong. And Bruin tells us if the regulation doesn't strike at that kind of conduct, doesn't implicate it, then the regulation is presumptively constitutional. And so, again, I return to this. So the conduct that this defendant was engaged in was possession of a weapon in the home, yes? Correct. Not used in connection with a crime? Not that we know of, no. Okay. Now, so why isn't that conduct protected at the core of the Second Amendment? I understand your arguments on Step 2. I'm just having difficulty understanding why we don't say he's satisfied. Step 1, he's possessing a firearm. Your Honor. For what seemed to be the traditional purposes of the Second Amendment. He is not a responsible citizen. He is not a lawful citizen. It goes back to the prior case of what true limiting principles are you really proposing? So I take it your response is, well, the legislature can make that determination subject to some political check. So that goes back to the elimination of the means. It does. It goes right back to the contradiction because we've thrown out means. You have no limits. If he or she was convicted when they were 18 and now they're 60 and they've been a, quote, law-abiding citizen for, do the math, I can't, they still would be prohibited from having a firearm despite this whole giant pass, there's no limit to what the government can do in terms of this lifetime ban. But the legislature can absolutely pass a system, and it can be a very detailed system, for determining when someone has earned their rights back, when it's safe to give someone, when someone's no longer mentally ill, when we know when people are no longer children, that's when they receive weapons. But irresponsible groups and groups deemed irresponsible by legislatures have always been excluded from this. And that's another way to look at this kind of law. We now know a lot more about people who have serious problems with anger management. And is it unreasonable for our Congress to say, we don't think it's a good idea, we don't think that people with serious anger management problems who have actually attacked someone in their own home, should be allowed to bear weapons, just like colonial Congresses were free to say, mentally ill folks don't get guns, children don't get guns, people who we don't trust to be full citizens don't get guns. They were free to say that, and I think the question we're posed with now is, why isn't our legislature free to say that? The answer to your question is Bruin. Bruin says we don't trust legislatures. We don't trust elected representatives of the people. We're judges and we know better than them, and therefore you have to jump through our hoops to get there. So what you're really suggesting to me is a regime very similar to the one we had before Bruin. We looked to see whether it was a reasonable decision by the legislature in light of all the facts in front of it, and the Supreme Court said, even though every circuit in the country applied that rule, the Supreme Court said that's not the rule. The rule isn't whether the legislature was reasonable or had good reason. The rule is, is it a person? Are you a member of the people? Is it a core right that you're exercising at the time? So maybe if you're committing a crime, it's not a core right, and if you get past that, give me a historical analog. So it seems to me it's the analogs you've got to come forward with, not good reasons why Congress would have done this. I think you're right, Your Honor, that Bruin eliminated that means and testing, so it eliminated in some ways the need for a really good reason, a demonstrably good reason. Well, it requires a historical analog. So I think in Bruin, step one, you can satisfy pretty easily, and you're going to have to go to the historical analog. It's got to be close. It doesn't need to be a twin, but it's got to be a pretty close historical analog. So what's your best one? So I think there are two types here. One is the disarming of people that legislatures deemed irresponsible and incapable of managing a weapon safely. And so that goes back to our same examples of disarming children mentally ill and not having and, yeah, disarming those groups, disarming groups who were not deemed trustworthy because they weren't willing to take an oath to support the republic and so on. So that's one analogy. And we'd say that's an analogy because they grow up and then they get the right firearms. Yes, and mentally ill folks. It's a lifetime ban. Does that pose a problem to your irresponsible category?  Again, the mentally ill category was highlighted by Heller, and that has long been an exclusion. That isn't to say that people don't recover. People do recover, and Congress could very well, and Congress is in a uniquely good position as opposed to courts, to fine-tune something, a test, and figure out when is someone no longer mentally ill so they should be entitled to that. Similarly, when has someone taken enough control and demonstrated enough control over anger issues to be entitled to their Second Amendment rights back? Congress can do that. And this defendant and many other defendants can lobby their legislators to do that. I mean, this is precisely how our political system is supposed to work. And so that's one analogy there. Congress is in a unique position to create the kind of detailed test that we would need to reinstate someone to their rights. And then the second one, well, the other two, are riding armed in terror of the people, that people were disarmed for, and legislatures had the power and understood themselves to have the power to disarm people if they had gone out carrying weapons for a wicked purpose, to engage in a fray or to cause a mischievous result. On that analogy, my difficulty is that the weapon was being used for an improper purpose, so they took it away from them. They were riding in terror of the people. Here the weapon is not being used at the time for an improper purpose. The weapon is just in his home. He's just forbidden to have it because he previously committed a dangerous act. Is there a difference between those two? Yes, Your Honor, and the surety or disarm statutes, which, again, there just isn't that much research yet on those, and it's happening as we speak. But those were statutes where typically an individual could come and complain, a fellow citizen could come and complain to authorities that they were worried that someone was going to use a weapon in a bad manner. They hadn't necessarily done it yet, but they were worried about it. And then that person could be required either to post a surety or be disarmed. So I think that might be a bit more analogous, Your Honor. But I think it's also important to realize what we're talking about here. Legislatures don't always legislate to the full extent of their power. So the fact that legislatures, colonial legislatures, felt free to disarm people because they were using guns for a bad purpose or felt free to disarm people if they wouldn't post a surety because another citizen complained against them, that shows us that those legislatures understood the Second Amendment right to give significant power to the legislature to regulate it. And I honestly think, despite the strange deprivation of the means and testing, second prong of the test, that with Bruin's discussion of that core Second Amendment conduct, it really is reasserting a tremendous amount of power for the legislature. It's saying the legislature absolutely lacks power, yes, but in this narrow core. It can't legislate people out of their rights in that narrow core. But its power outside of that narrow core is tremendous. I'm interested in where cases around the country are. Now, we've seen a bunch of district court cases. We've seen a circuit court case out of the Fifth Circuit, but it didn't involve a conviction. Correct. And the government has sought cert in that case? Correct, Your Honor. Are there other cases on the way to the Supreme Court or on the way to the courts of appeals that raise this issue? It's my understanding that the Third Circuit just heard an en banc argument in a related case. And I believe those are the only arguments that have occurred so far. I think this is the third one. Thank you. All right. Thank you very much, Kelly. Thank you, Your Honors. Let's put a couple minutes on the clock. There we go. All right. Thanks for the time, Your Honor. So really quickly, I want to address the government's claim that step one is a textual step, but that history can also be imported into it. That's not correct. And I think the Fifth Circuit really hits the nail on the head in Rahimi in explaining why. And it says that prior to Bruin, there was a dispute among jurists about how we use history. Either history is used to define the scope of the right or it's used to define the scope of the legislature's power to take it away. And Bruin clearly sided with the second group of jurists. It used plain text to define when someone presumptively has the right to bear arms and history when defining the legislature's regulatory power. So it really is just... Well, except the first step says, the plain text of the amendment, I think I'm quoting exactly, as informed by history. What is that? So under your reading, that second, that as informed by is redundant? I'm not aware of that language in Bruin. It very well could be there, Your Honour. I trust you. But I would have to look at the context. And I'm happy to submit a 28-page letter about it. No need. Bruin says what it says. But even so, Bruin's analysis clearly puts history into the second bucket. And if we were to mix the two, the burdens would get mixed up. It would be more confusing, less administrable. So the first step really is that textual analysis. I also just wanted to address the government's analogy to riding armed laws. I think Your Honours are exactly correct that these riding armed laws did not deprive people of firearms going forward, certainly not for the rest of their lives. And they were also directed at gun-related misconduct. So they involved somebody intentionally spreading fear and terror with a firearm. To be disarmed under 922 G9, you do not have even used the firearm in the offence or even committed any intentional conduct or any violent conduct. You simply have to have engaged in at least reckless, at least offensive touching. So with that, I see I'm out of time, unless Your Honours have further questions. Let me ask you this, a similar question, Judge Hurwitz. Are you aware of cases that the PD's office are litigating challenging the felon in possession statutes? Your Honour, we are actively litigating any gun cases that come before us. I know of a few in the pipeline, but because of when Bruin came down, they're all a little procedurally quirky and might not squarely present the issue. But I certainly think these issues are percolating in this court and across the country. That's the plan going forward, is to challenge the felon in possession statutes. I think it's fair to say, yes. Thank you. Thank you. I made an assumption. I just jumped back up here. Do I have more time? Yes. Certainly. Okay. The government described an orderly society. It is true that the Constitution was intended to create an orderly society, but not a dystopia where we punish people in the off chance that because of something they did 20 years ago, they might do it again. Merit's a year and a half in prison. In terms of the as applied to Mr. Yates, I would say that the court, rather than remand, could also do this. They could rule that the government has not met its burden of showing a historical analog for a lifetime ban. And because Mr. Yates was no longer on probation at the time he possessed the firearm, we go so far as to say that as applied to Mr. Yates, he's successful in this case, but we do not make a ruling today on whether a person who is under a sentence or is being sentenced for an enhancement or on probation or pre-trial release or whatnot cannot be prohibited from possessing a firearm because the record is devoid of anywhere that says a lifetime ban is something that can happen to anyone, felon, you know, whatnot. The other thing that I would mention is that there are other methods to accomplish this laudable goal of reducing misdemeanor domestic violence. It is something that is relatively new. It's something that in Idaho, even a misdemeanor under Title 18, 918 subsection 7, any conviction requires a domestic violence evaluation by an evaluator who's been approved by the Idaho Supreme Court, and the person must then follow and complete that course of treatment. So there are other ways to accomplish this goal that do not burden the Second Amendment right in terms of an orderly society. Any other questions for me? All right. Thank you very much, counsel, for all sides, for your very helpful arguments today. The matter is submitted.
judges: NGUYEN, HURWITZ, Gutierrez